**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-02770-PAB-CYC

SEUNG LEE, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

JURY TRIAL DEMANDED

QUANTUM CORPORATION,
JAMES J. LERNER,
KENNETH P. GIANELLA, and
LAURA NASH,

Defendants.

---

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

Lead Plaintiff Hunsu Son ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants Quantum Corporation ("Quantum" or "Company"), James J. Lerner, Kenneth P. Gianella, and Laura Nash (collectively, "Defendants"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Quantum, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Quantum; analysts' reports and advisories and other press coverage about Quantum; Quantum's stock chart; Quantum's corporate website; data from news services; interviews with former employees; and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of persons or entities who purchased publicly traded Quantum Corporation securities between August 14, 2024, and August 18, 2025, inclusive ("Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of sections 10(b) and 20(a) of the federal securities laws under the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b(5) promulgated thereunder.

2. Quantum is a storage company, designing storage solutions for primary software storage and systems, secondary storage software and systems, and devices and media. Between 2019 and 2025 Quantum had to restate its financial reports three times, each time admitting

failures to properly account for recognized revenue and material weaknesses in internal controls over financial reporting. The second restatement, in 2024, related to problems with Quantum's revenue recognition and GAAP provision ASC 606, specifically dealing with how Quantum calculated its standalone selling prices. In the wake of this 2024 restatement, Defendants reviewed hundreds of thousands of earlier transactions, and consulted with experts and with Quantum's auditor, professing to spend large amounts of time and money to get things right..

3. All for naught. Immediately following the 2024 Restatement Defendants again violated ASC 606 and issued more false financial statements, failing to update standalone selling prices as they had just admitted they were required to do, not only by ASC 606 but by Quantum's own accounting policies. As of the 2024 Restatement, Defendants claimed they knew exactly how to apply and update standalone selling prices. Nonetheless, they kept making the same errors in the immediately following periods, resulting in materially false financial statements.

4. Quantum published false financial statements for the first three quarters of fiscal year 2025. In the third quarter of 2025, Quantum overstated its revenue by almost $4 million, and understated net loss by that same amount.

5. Defendants were forced to restate their financial statements yet again in 2025. After having "cleaned house" by replacing all of its senior management after the first restatement, Quantum did so again in 2025, firing its CEO, CFO, and Chief Revenue Officer. As they gradually revealed the details and impact of this third restatement through a series of disclosures, Quantum's stock price fell, harming investors.

## II. JURISDICTION AND VENUE

6. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

9. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

10. Lead Plaintiff Hunsu Son, as evidenced by his previously-filed Certification (Dkt. 14-2), purchased Quantum Corporation securities during the Class Period and was economically damaged thereby.

11. Quantum Corporation is incorporated in Delaware with its principal executive offices at 10770 E. Briarwood Avenue, Centennial, CO 80112. The Company's common stock trades on the NASDAQ exchange under the ticker symbol "QMCO." Quantum is a technology company focused on data management solutions. It creates products including primary storage software and systems, secondary storage software and systems, and devices and media.

12. Defendant James J. Lerner ("Lerner") served as the Company's Chief Executive Officer ("CEO"), Chairman of the Board, and President from July 2018 until June 2, 2025. Lerner signed SOX Certifications for the August 14, 2024, Form 10-Q for the first quarter of fiscal year 2025 ("1Q25 10-Q"), the November 13, 2024 Form 10-Q for the second quarter of fiscal year 2025 ("2Q25 10-Q"), and the February 12, 2025 Form 10-Q for the third quarter of fiscal year 2025 (3Q25 10-Q").

13. Defendant Kenneth P. Gianella ("Gianella") served as the Company's Chief Financial Officer ("CFO") from January 2023 until April 3, 2025. Gianella signed SOX Certifications for the 1Q25 10-Q, the 2Q25 10-Q, and the 3Q25 10-Q.

14. Defendant Laura K. Nash ("Nash") has served as the Company's CFO and Chief Accounting Officer since August 18, 2025. She served as the Company's Chief Accounting Officer since June 2023, and the Company's Controller from June 2019 until June 2023.

15. Defendants Lerner, Gianella, and Nash are sometimes referred to herein as the "Individual Defendants."

16. For the quarterly and annual statements signed by Defendants Lerner and Gianella, as described *supra*., each Defendant signed Certifications for the statements certifying that:

> (a) I have reviewed this annual report on Form [10-K or 10-Q] of Quantum Corporation;
>
> (b) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> (c) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> (d) The registrant's certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > 1) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> 2) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> 3) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> 4) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

17. Further, in each quarterly and annual statement during the Class Period, Defendants signed SOX certifications stating that:

> I, ____________, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Quarterly Report of Quantum Corporation, on Form 10-Q for the quarterly period ended __________, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and that information contained in such Quarterly Report on Form 10-Q fairly presents in all material respects the financial condition and results of operations of Quantum Corporation.

18. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

19. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Quantum under *respondeat superior* and agency principles.

20. Defendant Quantum and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

21. According to its 2025 annual report on Form 10-K, filed with the SEC on August 26, 2025, Quantum's products include primary software storage and systems, secondary storage software and systems, and devices and media. Quantum offers global servicing of its products.[1] It delivers end-to-end data management solutions designed for unstructured data in the artificial intelligence era. Quantum specializes in solutions for video, images, audio, and other large files because this unstructured data represents more than 80% of all data being created according to leading industry analyst firms. Unstructured data is exponentially larger than traditional corporate data, contains tremendous value, and must be captured, protected, and stored for many years, decades, and longer.

22. Former employee ("FE") 1worked at Quantum from 2020-2025, and worked as a "Principal Solutions Architect" in the last year of his tenure. FE1 reported to Ed Ramon, Director of Pre-Sales Engineering.

23. According to FE1, senior sales personnel had authority to offer discounts on particular products or services to customers. Approvals from a pricing team, however, were required to ensure the profitability of each deal. Larger deals required approval from the CEO or CFO.

24. FE2 worked as a Regional Sales Manager at Quantum from January 2021 through December 2025. FE2 reported to District Sales Manager Scott Homes.

---

[1] Quantum's fiscal year runs from April 1-March 31. Thus, Quantum's fiscal 2025 concluded on March 31, 2025.

25. FE2 concurred with FE1 that the CEO and CFO were involved in sales to larger customers. On one occasion, FE2 states that Defendants Lerner and Gianella joined his sales call with a particular company's Chief Information Officer in order to close a deal on terms favorable to Quantum.

**B. The 2015-2018 Restatement**

26. On January 11, 2018, Quantum received a letter from the Securities and Exchange Commission ("SEC") regarding accounting practices and internal control related to revenue recognition for transactions starting from April 1, 2016.

27. In February 2018, both Quantum's audit committee and a "Special Committee" comprised of two members of the Board of Directors conducted an internal investigation, with the help of independent accounting and legal advisors, looking into matters related to Quantum's accounting practices and internal control over financial reporting related to revenue recognition for transactions occurring between January 1, 2016 and March 31, 2018.

28. In September 2018, the Special Committee substantially completed and finalized its principal findings with respect to its investigation, determining that Quantum engaged in business and sales practices that undermined Quantum's historical accounting treatment for transactions with several key distributors and at least one end customer. The identified transactions potentially affected by such practices commenced at least in the fourth quarter of fiscal 2015 and continued at least through the fourth quarter of fiscal 2018. The Special Committee also found that these business and sales practices may have resulted in the Company recognizing revenue for certain transactions prior to satisfying the criteria for revenue recognition required under U.S. Generally Accepted Accounting Principles ("GAAP").

29. On September 14, 2018, Quantum announced in a Form 8-K that its previously issued financial statements for fiscal years 2015-2018, as well as quarterly financial statements

during those years, should no longer be relied upon and required restatement.

30. At the same time, management assessed Quantum's internal control over financial reporting, concluding that Quantum's disclosure controls and procedures were not effective as of March 31, 2019. Quantum's auditor, Armanino, similarly concluded that Quantum's internal control over financial reporting was ineffective as of March 31, 2019. The Company announced that it had identified and implemented actions to improve the effectiveness of internal controls over financial reporting.

31. On August 6, 2019, Quantum filed a Form 8-K with the SEC, attaching a press release announcing the completion of the 2019 restatement, which stated:

> **Financial Restatement Summary**
>
> In September 2018 the Company announced the substantial completion of an internal investigation conducted by a Special Committee of the Board of Directors. This investigation concluded that the ***previous management, who have all been terminated or are no longer part of the Company***, had engaged in certain business and sales practices that may have undermined its historical accounting treatment for certain sales transactions with several distributors and at least one end customer. These practices led to the Company prematurely recognizing revenue. The Company's finance department, overseen by the Board's Audit Committee, completed its review of revenue for fiscal years 2015 through 2018 and ***identified approximately $180 million of revenue that was prematurely recorded***. The revenue restatement re-casted the timing of revenue, not the quality or accuracy of the revenue itself. Excluding the first and last quarters of the restatement period, the average quarterly net revenue adjustment ranged from a decrease of approximately $7 million to an increase of approximately $5 million. These restatement adjustments did not affect historical or current cash balances and there were no significant accounts receivable write-offs over the restatement periods. All of the inventory that is remaining in distributors' inventory and yet to be sold through to an end customer has been paid for by the distributor. Quantum expects to recognize the revenue from this remaining distributor inventory in the future when the products are sold to an end-customer. The total cost expected to be incurred for professional fees related to the internal investigation, financial restatement and related activities is approximately $33 million.

> In addition, the Company is cooperating with an on-going investigation by the SEC related to the restatement. Quantum has produced a substantial volume of documents to the SEC and continues to respond to information requests from the SEC staff.[2]

32. The same day, the Company published its 2019 annual report on Form 10-K, explaining the 2019 Restatement:

> **Explanatory Note**
>
> This Annual Report on Form 10-K for the fiscal year ended March 31, 2019 includes Quantum Corporation's ("Quantum", the "Company", "us" or "we") audited consolidated financial statements for the fiscal years ended March 31, 2019, 2018 and 2017. The consolidated financial statements for the fiscal year ended March 31, 2017 and selected financial data for the fiscal years ended March 31, 2017, 2016 (unaudited) and 2015 (unaudited) are restated.
>
> *Background of Special Committee Investigation and Subsequent Management Review*
>
> On January 11, 2018, we received a subpoena from the Securities and Exchange Commission ("SEC") regarding our accounting practices and internal controls related to revenue recognition for transactions commencing April 1, 2016. As a result, we postponed the release of our financial results for the third quarter of fiscal 2018. In February 2018, the Audit Committee ("Audit Committee") of our Board of Directors ("Board"), and subsequently a special committee of the Board (the "Special Committee") consisting of two members of the Audit Committee, conducted an internal investigation, with the assistance of independent accounting and legal advisors, into matters related to our accounting practices and internal control over financial reporting related to revenue recognition for transactions occurring between January 1, 2016 and March 31, 2018.
>
> In September 2018, the Special Committee substantially completed and finalized its principal findings with respect to its investigation. The principal findings included a determination that we engaged in certain business and sales practices that may have undermined our historical accounting treatment for transactions with several key distributors and at least one end customer. The Special Committee found that the identified transactions potentially affected by such practices commenced at least in the fourth quarter of fiscal 2015 and continued at least through the fourth quarter of fiscal 2018. ***The Special Committee also found that these business and sales practices may have resulted in the Company recognizing revenue for certain transactions prior to satisfying***

[2] All emphasis added unless otherwise noted.

***the criteria for revenue recognition required under U.S. Generally Accepted Accounting Principles ("U.S. GAAP").***

Upon the recommendation of the Audit Committee and as a result of the investigation by the Special Committee and after consultation with our management, on September 14, 2018, our Board of Directors concluded that our previously issued consolidated financial statements and other financial data for the fiscal years ended March 31, 2015, 2016 and 2017 contained in our Annual Reports on Form 10-K, and our condensed consolidated financial statements for each of the quarterly and year-to-date periods ended June 30, 2015, September 30, 2015, December 31, 2015, June 30, 2016, September 30, 2016, December 31, 2016, June 30, 2017 and September 30, 2017 (collectively, the "Non-Reliance Periods") should not be relied upon and required restatement. Our Board also determined that our disclosures related to these financial statements and related communications issued by or on behalf of the Company with respect to the Non-Reliance Periods, including management's assessment of internal control over financial reporting and disclosure controls and procedures, should not be relied upon.

In response to the findings of the Special Committee, we conducted a thorough review of our financial records for fiscal years ended March 31, 2015, 2016, 2017 and 2018 to determine whether further restatement adjustments were necessary. We concluded that there were material misstatements in the consolidated financial statements for the fiscal years ending March 31, 2015, 2016 and 2017, as well as in the unaudited condensed consolidated financial statements for the quarterly periods June 30, 2016, September 30, 2016, December 31, 2016, June 30, 2017, and September 30, 2017, in accordance with Accounting Standards Codification ("ASC") 250, Accounting Changes and Error Corrections.

We have not amended, and do not intend to amend, our Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for periods prior to September 30, 2017. The consolidated financial statements and related financial information contained in any of our Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q filed during the period commencing with the fourth quarter of fiscal 2015 and prior to this Annual Report on Form10-K for the fiscal year ended March 31, 2019 should no longer be relied upon. We have restated our consolidated financial statements for the fiscal year ended March 31, 2017 and included restated financial data and discussion related to the three months ended June 30, 2017 and the three- and six-month periods ended September 30, 2017 that would typically be disclosed in a Quarterly Report on Form 10-Q. Additionally, because we have failed to file Quarterly Reports on Form 10-Q for the fiscal quarter and year to date periods ended December 31, 2017, June 30, 2018, September 30, 2018 and December 31, 2018, we have included the financial data and discussion typically disclosed in a Quarterly Report on Form 10-Q for these

periods. The restatement also affects the fiscal years ended March 31, 2015 and 2016 and the impact of the restatement on those fiscal years is included in Item 6 Selected Financial Data included in this Annual Report on Form 10-K.

Note 2: Restatement and Note 13: Quarterly Financial Data (unaudited) to our consolidated financial statements in this Annual Report on Form10-K disclose the nature of the restatement matters and adjustments and shows the impact of the restatement matters on revenues, expenses, income, assets, liabilities, equity, and cash flows from operating activities, investing activities, and financing activities, and the cumulative effects of these adjustments.

*Internal Control over Financial Reporting*

As part of our review of our financial records for the Non-Reliance Periods, management, including our Chief Executive Officer and our Chief Financial Officer, assessed our internal control over financial reporting as of March 31, 2019. Based upon this assessment, we identified material weaknesses in our internal control over financial reporting and concluded that our internal control over financial reporting was not effective as of March 31, 2019. In addition, our Chief Executive Officer and Chief Financial Officer have evaluated the findings and conclusions of the Special Committee's investigation, as well as the review of our financial records, and based on this evaluation, taken together with the identified material weaknesses, have concluded that our disclosure controls and procedures were not effective at March 31, 2019. We have identified and implemented actions to improve the effectiveness of our internal control over financial reporting and disclosure controls and procedures. We intend to continue these remediation activities, including ongoing efforts to enhance our resources and train our employees on financial reporting and disclosure responsibilities, and the periodic review of such actions with the Audit Committee. For more information about management's determinations related to our internal control over financial reporting, including the identified material weaknesses, and our disclosure controls and procedures, as well as our remediation activities, please see Item 9A Controls and Procedures of this Annual Report on Form 10-K.

Our independent auditors, Armanino LLP, have audited management's assessment of internal control over financial reporting as of March 31, 2019 and in their opinion concluded that we did not maintain, in all material respects, effective internal control over financial reporting as of March 31, 2019, based on criteria established in *Internal Control—Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") because of the identified material weaknesses in our internal control over financial reporting existed as of March 31, 2019.

33. The 2019 Form 10-K disclosed several categories of restatement adjustments, with the first two related to revenue recognition issues. The first related to premature revenue recognition, which was the subject of the SEC subpoena and eventual enforcement action. The second related to improper amortization of service revenue also resulting in accelerated revenue recognition.

34. Prior to the 2019 Restatement, on November 9, 2017, Quantum announced that it had fired its CEO, Jon Gacek, who had been in that position since 2011. Gacek also left the Board of Directors.

35. Prior to the restatement, in June 2018, Quantum fired Fuad Ahmad, its CFO. Ahmad had served as CFO since April 2016.

36. In May 2018, Quantum appointed Mike Dodson as its new CFO.

37. In July 2018, Quantum appointed Defendant Jamie Lerner as its new CEO.

38. In January 2023, Defendant Gianella became Quantum's CFO.

39. In January 2019, Quantum was delisted by the NYSE for failure to file required financial statements. The Company relisted on the NASDAQ Global Market on February 3, 2020, under the ticker symbol QMCO.

40. On August 10, 2019, Quantum held an earnings conference call, Defendant Lerner's first as CEO, as part of what he stated was "an entirely new leadership team." Lerner stated that quantum had "conducted a significant operational restructuring" with "improved corporate governance," including shrinking senior management by 45% while adding a new CEO, CFO, Chief Revenue Officer, Chief Accounting Officer, Chief Information Officer, and Director of Internal Audit, among others.

41. During the earnings call, regarding the Restatement, Lerner described the problem as "related to the timing of revenue recognition" which had been recognized "prematurely."

42. In a press release dated December 23, 2019, Quantum announced that it had entered into a cease-and-desist Order with the SEC, requiring Quantum to pay a civil penalty of $1 million.

43. The cease-and-desist Order stated that between 2015 and 2018, Quantum had violated GAAP for revenue recognition, resulting from internal accounting control failures. The Order stated that "[d]uring the restatement period, Quantum's tone-at-the-top contributed to its insufficient internal accounting controls environment."

44. In the 2019 Restatement, Defendants similarly disclosed material weaknesses related to "tone-at-the-top," as contributing to the restatement.

**C. After the First Restatement, Quantum States that its Internal Controls Over Financial Reporting are Effective**

45. In the May 26, 2021, annual report for the fiscal year ended March 31, 2021 ("2021 10-K"), Quantum's auditor, Armanino LLP, issued a clean audit opinion. The auditor stated that "in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of March 31, 2021, based on the criteria established in Internal Control - Integrated Framework (2013) issued by COSO."

46. In the May 26, 2021, 2021 10-K, signed by Defendants Lerner and Gianella, Defendants stated that "We have concluded that our internal control over financial reporting and disclosure controls and procedures were effective as of March 31, 2021."

47. In the June 8, 2022, annual report for the fiscal year ended March 31, 2022 ("2022 10-K"), Quantum's auditor, Armanino LLP, issued a clean audit opinion. With respect to internal

control over financial reporting, Armanino LLP stated that "in our opinion, the Company maintained, in all material respects, effective internal controls over financial reporting as of March 31, 2022, based on the criteria established in Internal Controls - Integrated Framework (2013) issued by COSO."

48. Similarly, in the 2022 10-K, signed by Defendants Lerner and Gianella, in "Management's Annual Report on Internal Control over Financial Reporting," Defendants stated that "Our management, with the participation of our principal executive and principal financial officers, evaluated the effectiveness of our internal control over financial reporting using the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control—Integrated Framework (2013). Based on this assessment, management concluded that Quantum Corporation maintained effective internal control over financial reporting as of the end of the period covered by this Annual Report."

49. In the June 6, 2023, annual report for the fiscal year ended March 31, 2023 ("2023 10-K"), Quantum's auditor, Armanino LLP, issued a clean audit opinion. With respect to internal control over financial reporting, Armanino LLP stated that "in our opinion, the Company maintained, in all material respects, effective internal controls over financial reporting as of March 31, 2023, based on the criteria established in Internal Controls - Integrated Framework (2013) issued by COSO."

50. Similarly, in the 2023 10-K, signed by Defendants Lerner and Gianella, in "Management's Annual Report on Internal Control over Financial Reporting," Defendants stated that "our chief executive officer and chief financial officer concluded that, as of March 31, 2023, our disclosure controls and procedures were effective at the reasonable assurance level."

51. On July 27, 2023, in a press release attached to a Form 8-K, Quantum announced that its auditor, Armanino LLP, was resigning.

52. In a Form 8-K dated August 21, 2023, Quantum announced that its audit committee appointed Grant Thornton LLP as Quantum's new auditor.

**D. The 2024 Restatement**

53. Quantum's second Restatement involved another revenue recognition GAAP violation, the misapplication of standalone selling prices as required by ASC 606.

54. A standalone selling price ("SSP") is the price at which a company would sell a specific good or service to a customer if it were sold separately, not as part of a bundle or with any discounts. It is crucial for revenue recognition, as it helps businesses allocate the total price of a bundled contract to each distinct component (performance obligation) based on its individual fair value, following accounting standards like ASC 606. A company must also determine standalone selling prices for items that are never sold separately, but only as part of a package.

55. In the 2023 10-K, for example, Defendants stated that they regularly used invoice price as the SSP:

> There are significant judgements used when applying Accounting Standards Codification ("ASC") Topic 606 to contracts with customers. Most of our contracts contain multiple goods and services designed to meet each customers' unique storage needs. For contracts with multiple performance obligations, we allocate the transaction price to each performance obligation based on the relative standalone selling price of the good or service underlying each performance obligation. Where standalone selling price may not be directly observable (e.g., the performance obligation is not sold separately), we maximize the use of observable inputs by using information including reviewing discounting practices, performance obligations with similar customers and product groupings. ***We determined that invoice price is the best representation of what we expect to receive from the delivery of each performance obligation.*** This judgment is based on the fact that each storage solution is customizable to meet an individual customer's needs and every product's transaction price can vary depending on the mix of other products included in the same purchase order and there are no identifiable trends that provide a good representation of expected margin for each product.

56. However, as Defendants later admitted in the 2024 Restatement, the practice of using invoice price as the SSP violated GAAP provision ASC 606, "Revenue from Contracts with Customers," and Quantum's application of ASC 606 was "inconsistent with the generally accepted application of the guidance."

57. On November 13, 2023 and February 14, 2024, Quantum filed Forms NT 10-Q for the second and third quarter of fiscal 2024, respectively, in which it disclosed that "The Company is conducting a re-evaluation of its application of standalone selling price under Accounting Standards Codification Topic 606 and the financial re-evaluation process is taking longer than expected. The Company has not completed this evaluation and has no findings to report at this time."

58. The 2024 Form 10-K, filed on June 28, 2024, contained a restatement of fiscal 2022, fiscal 2023, and 1Q24 financial statements.[3] The restatements involved (a) application of Topic 606 related to standalone selling price and (b) application of Topic 815 related to classification of outstanding warrants:

> As described in Note 1: Description of Business and Significant Accounting Policies, and as further described below, ***in November 2023, the Company determined that it was necessary to re-evaluate its application of standalone selling price under Topic 606. The Company concluded that its application of Topic 606 related to standalone selling price was inconsistent with the generally accepted application of the guidance. The Company's management reperformed the determination of standalone selling price with the support of external advisors, and the resulting calculations have been applied to the revenue allocations in the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022.*** The Company additionally identified contractual terms contained within outstanding warrant agreements issued to its prior and current lenders in 2018, 2020 and 2023, which required further evaluation under Topic

[3] Although the restatement disclosure does not state that the 1Q24 financial statements were restated, the quarterly information presented in the 2024 10-K marked the 1Q24 information "as restated" and the impacted line items include "Total Revenue."

815. After consulting with external advisors and completing an extensive review process, management concluded that the classification of warrants as equity was not consistent with Topic 815 and has restated them as a liability. This also resulted in the requirement to account for the change in the fair value of the warrants through the Statement of Operations. As a result of these errors, the Company is restating the financial statements for the years ended March 31, 2023 and 2022.

The nature of the restatement adjustments and their impact on previously reported consolidated financial statements is as follows:

a. **Application of Topic 606 related to standalone selling price - The Company historically used invoice price as the standalone selling price for all goods and services. This was partly because of the high level of customization for each product sold and because the pricing for individual performance obligations is highly variable. *Standalone selling price has now been established for all goods and services sold in a bundled contract using the adjusted market assessment approach or the cost plus a reasonable margin approach and maximizing the use of observable inputs.*** The impact on the consolidated statement of operations and comprehensive loss for the fiscal years ended March 31, 2022 and March 31, 2023 is an increase to product revenue of $7.1 million and $8.3 million respectively, an increase to service revenue of $ 3.6 million and $1.0 million respectively, and a decrease to pre-tax loss of $10.6 million and $9.3 million respectively. The impact to the consolidated balance sheet at March 31, 2022 and March 31, 2023 is an increase to short term deferred revenue of $0.6 million as at March 31, 2022, a decrease to short term deferred revenue of $ 2.7 million as at March 31, 2023, and a decrease to long term deferred revenue of $1.8 million and $7.8 million, respectively.

59. The 2024 10-K's disclosure of Quantum's accounting policy laid out the method of determining SSP that Quantum acknowledged it should have been using, rather than using invoice price as the standalone selling price:

**Revenue Recognition**

Our revenue is derived from three main sources: (a) products, (b) service and subscription, and (c) royalties. Our performance obligations are satisfied at a point in time or over time as stand ready obligations**.** Product revenue is recognized at the point in time when the customer takes control of the product, which typically occurs at the point of shipment. Service and subscription revenue consists of customer support agreements, software subscriptions, installation, and consulting & training. Our software subscriptions include term licenses which are recognized as revenue when the license has been delivered to the customer and

> related customer support which is recognized ratably over the service period. Revenue from customer support agreements is recognized ratably over the contractual term of the agreement. Installation services are typically completed within a short period of time and revenue from these services are recognized at the point when installation is complete. A majority of our consulting and training revenue does not take significant time to complete therefore these obligations are satisfied upon completion of such services at a point in time. We license certain products under royalty arrangements, pursuant to which our licensees periodically provide us with reports containing units sold to end users subject to the royalties. The reports substantiate that our performance obligation has been satisfied and we recognize royalty revenue based on the reports or when amounts can be reasonably estimated.
>
> There are significant judgments used when applying Accounting Standards Codification ("ASC") Topic 606 to contracts with customers. ***Most of our contracts contain multiple goods and services designed to meet each customer's unique storage needs. For contracts with multiple performance obligations, we allocate the transaction price to each performance obligation based on the relative standalone selling price of the good or service underlying each performance obligation. Where standalone selling price may not be directly observable (e.g., the performance obligation is not sold separately), we maximize the use of observable inputs by using information including internal discounting practices, competitor pricing, competitor margins, performance obligations with similar customers and product groupings. Determining the observable inputs and applying them to our performance obligations requires significant judgment. We reassess standalone selling price determination periodically.***
>
> ***
>
> **Stand-alone selling price**
>
> For contracts with multiple performance obligations, the Company allocates the transaction price to each performance obligation based on the relative standalone selling price ("SSP") of the good or service underlying each performance obligation. The SSP represents the amount for which the Company would sell the good or service to a customer on a standalone basis (i.e., not sold as a bundle with any other products or services). ***Where SSP may not be directly observable (e.g., the performance obligation is not sold separately), the Company maximized the use of observable inputs by using information including historical and current selling prices, internal discounting practices competitor information for similar customers and similar products/services, and other observable inputs.***

60. The Company disclosed in the 2024 10-K that its internal control over financial reporting was ineffective, and specifically discussed its inadequate controls relating to the calculation of standalone selling price:

> ***The Company identified a material weakness in its internal control over financial reporting related to the Company's accounting practices and procedures for the application of standalone selling price under Accounting Standards Codification Topic 606 Revenue from Contracts with Customers ("Topic 606"). Specifically, the Company did not have adequate controls in place to conclude on the application of standalone selling price consistent with the generally accepted application of the guidance in Topic 606. The absence of adequate controls with respect to the application of standalone selling price impacted the accuracy of the Company's revenue allocations in (i) for the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, and (ii) for each of the first three quarters in such fiscal years.***
>
> Additionally, the Company identified a material weakness in its internal control over financial reporting related to the Company's accounting practices and procedures for warrant agreements under Accounting Standards Codification Topic 815 Contracts in Entity's Own Equity ("Topic 815"). Specifically, the Company did not have adequate controls in place to accurately evaluate and classify warrants consistent with Topic 815. The absence of adequate controls with respect to the classification of warrants resulted in warrants being classified as equity and not as liability, impacted the accuracy of the Company's presentation in (i) for the fiscal years ended March 31, 2024, March 31, 2023 and March 31, 2022, and (ii) for each of the first three quarters in such fiscal years.
>
> Further, the Company identified a material weakness in its internal control over financial reporting as effective controls were not maintained over the accuracy of the inputs in the sales order entry process. ***Specifically, the Company did not sufficiently execute controls over the review of data inputs in the sales order entry process to ensure accuracy of the price, quantity, and related customer data.*** The control deficiency did not result in a misstatement; however, this control deficiency could result in a misstatement of revenue that would result in a material misstatement to the annual or interim consolidated financial statements for the fiscal year ended March 31, 2024 that would not be prevented or detected.

61. Quantum also disclosed in the 2024 10-K its plans for remediating its ineffective internal controls:

> **Remediation Plan**
> The Company is implementing enhancements to its internal controls to remediate the identified material weaknesses in its internal control over financial reporting related to the Company's accounting practices and procedures. Specifically, the Company plans to:
>
> - Review and update significant relevant accounting policies, procedures and controls.

- Provide additional training to individuals involved in the assessments for these topics.
- Engage with external third parties to assist with assessments for these topics, where necessary.

> The Company is committed to maintaining a strong internal control environment and believes these remediation efforts will represent significant improvements in its controls over the control environment. These steps will take time to be fully implemented and confirmed to be effective and sustainable. Additional controls may also be required over time. While the Company believes that these efforts will improve its internal control over financial reporting, the Company will not be able to conclude whether the steps the Company is taking will remediate the material weakness in internal control over financial reporting until a sufficient period of time has passed to allow management to test the design and operational effectiveness of the new and enhanced controls. Until the remediation steps set forth above are fully implemented and tested, the material weaknesses described above will continue to exist.

62. During the June 17, 2024, 4Q24 earnings conference call, just prior to the start of the Class Period, Defendants reassured investors that they had gone above and beyond in evaluating and fixing the Company's problems with SSPs. In prepared remarks, Defendant Lerner described the scope of Quantum's efforts:

> We truly appreciate investors patience and support, acknowledging the extended period during which the company was not able to comment on our ongoing business performance and conditions. ***The reevaluation was done in conjunction with the top consultants in the industry and we took a fresh look at everything, including <u>analyzing hundreds of thousands of transactions over the last five years</u>***.
>
> Before Ken walks through the specific change in methodology and details of the associated adjustments, I would like to acknowledge that ***while this process was a time consuming and expensive project to undertake, this should reinforce to our stakeholders that Quantum holds itself to the highest standards to ensure our financial reporting methodologies are correct, compliant, and reflect the company's current and future business outlook.***
>
> While working with Grant Thornton on our first filing with them in fiscal 02 2024, we identified the need to re-evaluate our historical approach for establishing standalone selling price, or SSP, under ASC Topic 606. This effort was purely an accounting interpretation and an adjustment focused on the application of SSP.

63. Thus, in the period immediately preceding the Class Period, Defendants told investors that they took great time and expense, and consulted with consultants and Quantum's auditor in correcting their prior SSP calculations to ensure their reporting methodologies reflected were correct and met the "highest standard," that they now knew how to properly calculate SSP, further adding that "Quantum is committed to maintaining the highest standards of financial integrity and transparency.

64. Defendant Gianella added during the June 17, 2024, 4Q24 earnings conference call that "the company has spent significant time and capital on several self-help projects, including our … restatement due to SSP and warrants…."

65. In the 2024 10-K, filed with the SEC on June 28, 2024, the Company's auditor, Grant Thronton, included its audit opinion making clear that the auditor had discussed standalone selling prices with Quantum:

> **REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**
>
> Board of Directors and Shareholders
> Quantum Corporation
>
> **Opinion on the financial statements**
> We have audited the accompanying consolidated balance sheet of Quantum Corporation (a Delaware corporation) and subsidiaries (the "Company") as of March 31, 2024, the related consolidated statement of operations and comprehensive loss, consolidated statement of stockholders' deficit, and cash flows for the year ended March 31, 2024, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of March 31, 2024, and the results of its operations and its cash flows for the year ended March 31, 2024, in conformity with accounting principles generally accepted in the United States of America.
>
> **Going concern**
> The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, as of March 31, 2024, the Company was in

default of certain debt covenants of its term debt and credit facility and obtained a waiver from its lenders. All defaults existing at March 31, 2024 were waived by the lenders through July 2024. The Company believes it is probable that it will be in violation certain debt covenants at the next testing date of July 2024. The Company's plan, which is also described in Note 1, contemplates the Company obtaining additional covenant waivers or refinancing the existing term debt and credit facility. Additionally, the Company is evaluating strategies to obtain the additional funding, including potential asset sales. In the event the Company is unable to obtain an extension of the waiver additional funding will be required to pay the amount due on the revolver and term loan. However, the Company may be unable to obtain an extension of the waiver or obtain additional funding. As such, there can be no assurance that the Company will be able to obtain additional liquidity when needed or under acceptable terms, if at all. The Company's ability to achieve this plan is uncertain and raises substantial doubt about its ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provide a reasonable basis for our opinion.

**Critical audit matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Determination of Standalone Selling Price*

As described further in Note 1 to the financial statements, the Company's contracts with customers often include multiple performance obligations. The transaction price of each contract is allocated to individual performance obligations based upon relative stand-alone selling price ("SSP"). The SSP of performance obligations is determined based on observable prices at which the Company separately sells the products and services or alternative methods. ***We identified the determination of the SSP of performance obligations as a critical audit matter***.

The principal consideration for our assessment that the determination of the SSP of performance obligations represents a critical audit matter is that the estimates made in determining SSP involve significant judgments. Evaluating the appropriateness of these estimates requires a high degree of auditor judgment and an increased extent of effort.

***Our audit procedures related to the determination of the SSP of performance obligations included the following procedures, among others:***

***•Tested management's process for developing the estimates of SSP by evaluating the appropriateness of the overall methodology used by management to develop the estimates by considering (i) whether the methodology maximized the use of observable inputs available and (ii) making inquiries of staff members outside of the accounting department.***

***•Tested the accuracy of management's calculations of estimated selling prices.***

***•In the cases where directly observable standalone sales were not available, for selected items we evaluated whether the significant assumptions used by management were reasonable by (i) considering the consistency with external market and competitor margin data and (ii) making inquiries of staff members outside of the accounting department.***

/s/ GRANT THORNTON LLP

**E. The 2025 Restatement**

66. After reviewing "hundreds of thousands" of transactions at the time of the second restatement, in consultation with experts and Quantum's auditor, to learn how to correctly compute and apply standalone selling prices in accordance with GAAP provision ASC 606, dealing with revenue recognition, and after disclosing its new accounting policy requiring Quantum to periodically reassess SSP determination, Defendants immediately turned around and violated ASC 606 again in the first three quarters of fiscal 2025, requiring the 2025 Restatement, the Company's third in six years.

67. Starting immediately after the 2024 Restatement, with the 1Q25 financial statements, and continuing with the 2Q25 and then the 3Q25 financial statements, Defendants failed in their obligations under GAAP to update their standalone selling prices.

68. Defendants admitted in their 2025 10-K that "the standalone selling price that is used to allocate revenue under Topic 606 needed to be updated." This update should have occurred in 1Q25, and continued in the next two financial quarters.

69. Defendant's failure to comply with their GAAP obligations they had seemingly just corrected caused them to overstate revenue and understate net loss by approximately $4 million in 3Q25, requiring another restatement. The disclosure of this third restatement caused Quantum's stock price to decline, harming investors.

70. Further, in each of the 1Q25 10-Q, the 2Q25 10-Q, and the 3Q25 10-Q, Defendants stated that their internal controls over financial reporting were "not effective." Defendants Lerner and Gianella assured investors that the financial statements were nonetheless accurate, writing in each 10-Q that:

> Notwithstanding the identified material weaknesses, management, including our chief executive officer and chief financial officer have determined, that the

> condensed consolidated financial statements included in this Form 10-Q fairly represent in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, for the periods presented in accordance with U.S. generally accepted accounting principles.

71. Thus, following the 2024 Restatement, investors reasonably believed that the Company had solved its problems with standalone selling price, that Defendants would follow GAAP for revenue recognition from that point forward, and that notwithstanding weaknesses in financial reporting, Quantum's financial statements were correct.

72. Instead, upon the announcement of the 2025 Restatement, investors discovered that beginning with the start of fiscal year 2025, in April 2024, Defendants had shirked their duty to update standalone selling price, leading to the material overstatement of revenue in the third fiscal quarter of 2025 and a material fall in Quantum's stock price upon its correction.

**F. Defendants Violated GAAP for Accounting for Revenue**

*GAAP- Generally*

73. Generally Accepted Accounting Principles ("GAAP") constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that companies in the United States use to prepare their financial statements.

74. The Securities and Exchange Commission ("SEC" or the "Commission") has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). The SEC Rules and interpretive releases and the FASB Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. ASC 105-10-05-1. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not

prepared in compliance with GAAP are presumed to be misleading and inaccurate despite footnote or other disclosures, unless the Commission has otherwise provided. SEC rules and regulations require that publicly traded companies such as Quantum include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC (See Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of SEC Regulation S-X). Regulation S-X requires interim financial statements to also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. § 210.10-01(a)).

75. FASB's Statements of Financial Accounting Concepts provide the framework for financial accounting. As stated in FASB's Statement of Financial Accounting Concepts No. 8 ("CON 8"), Chapter 1, "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." [Footnote omitted.] CON 8, Ch. 1 ¶ OB2.

76. CON 8 provides that financial reports play an important role when individuals and firms make financial decisions:

> General purpose financial reports provide information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity. Financial reports also provide information about the effects of transactions and other events that change a reporting entity's economic resources and claims. Both types of information provide useful input for decisions about providing resources to an entity. CON 8, Ch. 1 ¶ OB12.

77. In order for the financial information to be useful, "it must be relevant and faithfully represent what it purports to represent." CON 8, Ch. 3 ¶ C4. "Relevant financial information is capable of making a difference in the decisions made by users … if it has

predictive value, confirmatory value, or both." CON 8, Ch. 3 ¶¶ QC6 – QC7. Faithful representation refers to a depiction of an economic phenomena that is "*complete, neutral*, and *free from error*." [Emphasis in the original.] CON 8, Ch. 3 ¶ QC12.

78. "A complete depiction includes all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations." CON 8, Ch. 3 ¶ QC13. Neutral, means depicted without a bias. CON 8, Ch. 3 ¶ QC14. "Free from error means there are no errors or omissions in the description of the phenomenon, and the process used to produce the reported information has been selected and applied with no errors in the process. In this context, free from error does not mean perfectly accurate in all respects." CON 8, Ch. 3 ¶ QC 15.

*Accounting for Revenue*

79. ASC topic 606, *Revenue from Contracts with Customers*, is the authoritative standard which governs accounting for revenue recognition. The core principle of the guidance included in ASC 606 is that revenue recognized by an entity should depict the transfer of promised goods or services to customers in an amount that reflects the consideration (i.e., the selling price) to which the entity expects to be entitled in exchange for those goods or services. ASC 606-10-10-2. An entity is required to recognize revenue in accordance with the following five steps:

Step 1: Identify the contract with a customer.[4]
Step 2: Identify performance obligations in the contract.[5]
Step 3: Determine the transaction price.[6]
Step 4: Allocate the transaction price to the performance obligations in the contract.
Step 5: Recognize revenue when (or as) the performance obligation is satisfied.
ASC 606-10-05-4

80. With respect to Step 4: "An entity typically allocates the transaction price to each performance obligation on the basis of the relative standalone selling prices of each distinct good or service promised in the contract. If a standalone selling price is not observable, an entity estimates it." ASC 606-10-05-4. "The objective when allocating the transaction price is for an entity to allocate the transaction price to each performance obligation (or distinct good or service) in an amount that depicts the amount of consideration to which the entity expects to be entitled in exchange for transferring the promised goods or services to the customer." ASC 606-10-32-28.

81. More specifically, "[t]o allocate the transaction price to each performance obligation on a relative standalone selling price basis, an entity shall determine the standalone selling price at contract inception of the distinct good or service underlying each performance obligation in the contract and allocate the transaction price in proportion to those standalone

[4] "A contract is an agreement between two or more parties that creates enforceable rights and obligations. Enforceability of the rights and obligations in a contract is a matter of law. Contracts can be written, oral, or implied by an entity's customary business practices." ASC 606-10-25-2.

[5] "At contract inception, an entity shall assess the goods or services promised in a contract with a customer and shall identify as a performance obligation each promise to transfer to the customer either: (a) a good or service (or a bundle of goods or services) that is distinct" or "(b) a series of distinct goods or services that are substantially the same and that have the same pattern of transfer to the customer." ASC 606-10-25-14.

[6] "The transaction price is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. The transaction price can be a fixed amount of customer consideration, but it may sometimes include variable consideration or consideration in a form other than cash." ASC 606-10-05-4.

selling prices." ASC 606-10-32-31. "The standalone selling price is the price at which an entity would sell a promised good or service separately to a customer. The best evidence of a standalone selling price is the observable price of a good or service when the entity sells that good or service separately in similar circumstances and to similar customers. A contractually stated price or a list price for a good or service may be (but shall not be presumed to be) the standalone selling price of that good or service." ASC 606-10-32-32. "If a standalone selling price is not directly observable, an entity shall estimate the standalone selling price … . When estimating a standalone selling price, an entity shall consider all information (including market conditions, entity-specific factors, and information about the customer or class of customer) that is reasonably available to the entity. In doing so, an entity shall maximize the use of observable inputs and apply estimation methods consistently in similar circumstances." ASC 606-10-32-33.

82. With respect to Step 5: "An entity shall recognize revenue when (or as) the entity satisfies a performance obligation by transferring a promised good or service (that is, an asset) to a customer. An asset is transferred when (or as) the customer obtains control of that asset." ASC 606-10-25-23. An entity is required to "determine at contract inception whether it satisfies the performance obligation over time or … at a point in time. … If an entity does not satisfy a performance obligation over time, the performance obligation is satisfied at a point in time." ASC 606-10-25-24.

83. Revenue is recognized over time if any of the following three criteria are met:

(a) "The customer simultaneously receives and consumes the benefits provided by the entity's performance as the entity performs…

(b) The entity's performance creates or enhances an asset (for example, work in process) that the customer controls as the asset is created or enhanced…

(c) The entity's performance does not create an asset with an alternative use to the entity…and the entity has an enforceable right to payment for performance completed to date …" ASC 606-10-25-27.

84. With respect to performance obligations satisfied over time, ASC 606 requires companies to "recognize revenue over time by measuring the progress toward complete satisfaction of that performance obligation. The objective when measuring progress is to depict an entity's performance in transferring control of goods or services promised to a customer (that is, the satisfaction of an entity's performance obligation)." ASC 606-10-25-31. "An entity shall apply a single method of measuring progress for each performance obligation satisfied over time, and the entity shall apply that method consistently to similar performance obligations and in similar circumstances. At the end of each reporting period, an entity shall remeasure its progress toward complete satisfaction of a performance obligation satisfied over time." ASC 606-10-25-32.

85. "An entity should use judgment when selecting an appropriate method of measuring progress toward complete satisfaction of a performance obligation. That does not mean that an entity has a 'free choice.' The guidance states that an entity should select a method of measuring progress that is consistent with the clearly stated objective of depicting the entity's performance—that is, the satisfaction of an entity's performance obligation in transferring control of goods or services to the customer." ASU 2014-09 BC159.79.4.

86. "Appropriate methods of measuring progress include output methods and input methods." ASC 606-10-25-33. "Output methods recognize revenue on the basis of direct measurements of the value to the customer of the goods or services transferred to date relative

---

[7] Accounting Standards Update ("ASU") 2014-09, which was issued by the FASB, established ASC 606.

to the remaining goods or services promised under the contract. Output methods include methods such as surveys of performance completed to date, appraisals of results achieved, milestones reached, time elapsed, and units produced or units delivered." ASC 606-10-55-17. "Input methods recognize revenue on the basis of the entity's efforts or inputs to the satisfaction of a performance obligation (for example, resources consumed, labor hours expended, costs incurred, time elapsed, or machine hours used) relative to the total expected inputs to the satisfaction of that performance obligation." ASC 606-10-55-20.

87. ASC 606 requires entities include disclosures of "the significant judgments, and changes in the judgments, made in applying the revenue recognition guidance" "to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers:" ASC 606-10-50-1. Furthermore, entities are required to "disaggregate revenue recognized from contracts with customers into categories that depict how the nature, amount, timing, and uncertainty of revenue and cash flows are affected by economic factors." ASC 606-10-50-5.

88. With respect to step 4, and standalone selling price, Defendants admit that they violated ASC 606 in the Restatement at issue here. Defendants further admit this GAAP violation despite having just reviewed hundreds of thousands of transactions in setting standalone selling prices as part of the earlier, 2024 Restatement. Defendants admit that because of their failure to update standalone selling prices for fiscal year 2025, the Company overstated revenue by approximately $3.9 million in 3Q25, and understated net loss by the same amount.

*Accounting for Restatements*

89. GAAP requires any error in the financial statements of a prior period discovered after the financial statements are issued to be reported as an error correction by restating the

prior-period financial statements and providing a description of the nature of the error and its effect on the financial statements. ASC 250-10-45-23 and ASC 250-10-50-7.

90. ASC 250 distinguishes errors from accounting changes and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." ASC 250-10-20.

91. ASC 250 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements, which requires the following:

a. The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

b. An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

c. Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error. ASC 250-10-45-23.

92. ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error," including "the effect of the correction on each financial statement line item… for each prior period presented" and "the cumulative effect of the change on retained earnings … as of the beginning of the earliest period presented." ASC 250-10-50-7.

93. The SEC Staff Accounting Bulletins No. 99, Materiality, and No. 108, Quantifying Financial Statement Misstatements, ("SAB 99" and "SAB 108") are the primary source of guidance in assessing materiality of financial statement misstatements. Because GAAP

does not apply to immaterial items (ASC 105-10-05-6), a restatement is required only for items deemed to be material.

94. In addition, Item 4.02 of Form 8-K requires specific disclosures when "the registrant's board of directors … concludes that any previously issued financial statements … should no longer be relied upon because of an error in such financial statements."

*Materiality*

95. FASB's Statements of Financial Accounting Concepts ("CON") provide the framework for financial accounting, including the concept of materiality. According to CON 8, "[t]he omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." CON 8, Ch. 3 ¶ QC11.

96. Further guidance on materiality is provided by SEC Staff Accounting Bulletin ("SAB") Topics 1.M and 1.N (generally referred to as SAB Nos. 99 and 108, respectively). SAB 99 offers the most comprehensive guidance on the determination of materiality of misstatements of financial statements. It brings together guidance from financial accounting standards, auditing standards, and decisions of the United States Supreme Court. SAB 99 addresses misstatements or omission of amounts, classifications, manner of presentation, and disclosures in financial statements. It provides that the materiality assessment must be based on consideration of all relevant circumstances--the "total mix" of information, including the size of the misstatement and the context in which the user of the financial statements would view the item. It also sets forth the SEC Staff's view that there are circumstances in which misstatements below a percentage threshold (e.g., 5 percent) could be material.

97. According to SAB 99, a misstatement may be material if, among other things, it:

(a) arises from an item capable of precise measurement or from an estimate and, if so, degree of imprecision inherent in the estimate,

(b) masks a change in earnings or other trends,

(c) hides a failure to meet analysts' consensus expectations for the enterprise,

(d) concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability, or

(e) has the effect of increasing management's compensation, among others.

98. According to SAB 99, the materiality of a misstatement may turn on where it appears in the financial statements. "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important. … The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item. … The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality." SAB 99.

## V. FALSE AND MISLEADING STATEMENTS AND OMISSIONS

99. During the June 17, 2024, 4Q24 earnings conference call, which took place during 1Q25, Defendant Lerner stated the following regarding Quantum's work on correctly calculating and applying standalone selling prices, including working with experts and with Quantum's auditor:

> We truly appreciate investors patience and support, acknowledging the extended period during which the company was not able to comment on our ongoing business performance and conditions. The reevaluation was done in conjunction

> with the top consultants in the industry and we took a fresh look at everything, including analyzing hundreds of thousands of transactions over the last five years.
>
> Before Ken walks through the specific change in methodology and details of the associated adjustments, I would like to acknowledge that while this process was a time consuming and expensive project to undertake, this should reinforce to our stakeholders that Quantum holds itself to the highest standards to ensure our financial reporting methodologies are correct, compliant, and reflect the company's current and future business outlook.
>
> While working with Grant Thornton on our first filing with them in fiscal 02 2024, we identified the need to re-evaluate our historical approach for establishing standalone selling price, or SSP, under ASC Topic 606. This effort was purely an accounting interpretation and an adjustment focused on the application of SSP.

100. The foregoing statement, in the context of stating that Quantum had corrected its years-long SSP methodology failures after having consulted with experts and with Quantum's auditor, was materially false and misleading because, having stated that its methodologies were correct due to its "time consuming and expensive project," Defendants were duty-bound to disclose that as Defendant Lerner spoke, during the first quarter of 2025, Defendants had already failed to update standalone selling prices in 1Q25, thus their financial reporting methodology was not correct or compliant with GAAP, indeed violated both GAAP and Quantum's own accounting policies.

101. On August 4, 2024, Quantum filed with the SEC the 1Q25 10-Q including the financial statements for 1Q25. The financial statements listed total revenue of $71,343,000, and a net loss of $20,820,000.

102. The foregoing statements were materially false and misleading as Defendants later admitted, due to (1) failure to update standalone selling prices and (2) failure to recognize service and subscription revenue ratably over the contractual term of the contract, resulting in the financial statements being materially misstated. As corrected, Quantum's total revenue was

$72,265,000, and its net loss was $19,898,000.

103. As discussed supra, Defendants Lerner and Gianella signed SOX certifications attesting to the accuracy of the 1Q25 financial statements.

104. The foregoing SOX certifications were materially false and misleading because:

(a) The financial statements calculations for total revenue and net loss were materially false;

(b) Specifically, with actual knowledge of ineffective internal controls, and having professed to learn the correct way to (1) calculate standalone selling price and to (2) determine the period over which to recognize service and subscription revenue, both of which were the subject of previous restatement, Defendants reported qualitatively and/or quantitatively false financial numbers for 1Q25.

105. On November 14, 2024, Quantum filed with the SEC the 2Q25 10-Q including the financial statements for 2Q25. The filing listed total revenue of $70,469,000, and a net loss of $13, 527,000.

106. The foregoing filing was materially false and misleading because, as Defendants later admitted, due to (1) failure to update standalone selling prices and (2) failure to recognize service and subscription revenue ratably over the contractual term of the contract, resulting in the financial statements being materially misstated. As corrected, Quantum's total revenue was $71,846,000, and its net loss was $12,150,000.

107. As discussed supra, Defendants Lerner and Gianella signed SOX certifications attesting to the accuracy of the 2Q25 financial statements.

108. The foregoing SOX certifications were materially false and misleading because:

(a) The financial statements calculations for total revenue and net loss were

materially false;

(b) Specifically, with actual knowledge of ineffective internal controls, and having professed to learn the correct way to (1) calculate standalone selling price and to (2) determine the period over which to recognize service and subscription revenue, both of which were the subject of the 2024 Restatement, Defendants reported qualitatively and/or quantitatively false financial numbers for 2Q25.

109. On February 12, 2025, Quantum filed with the SEC the 3Q25 10-Q including the financial statements for 3Q25. The filing listed total revenue of $72,551,000, and a net loss of $71,433,000.

110. The foregoing filing was materially false and misleading as Defendants later admitted, due to (1) misapplication of standalone selling prices and (2) failure to recognize service and subscription revenue ratably over the contractual term of the contract, resulting in the financial statements being materially misstated and requiring restatement. Quantum overstated total revenue by $3,867,000, and understated net loss by $3,867,000, As restated, Quantum's total revenue was $68,684,000, and its net loss was $75,300,000.

111. As discussed supra, Defendants Lerner and Gianella signed SOX certifications attesting to the accuracy of the 3Q25 financial statements.

112. The foregoing SOX certifications were materially false and misleading because:

(a) The financial statements calculations for total revenue and net loss were materially false;

(b) Specifically, with actual knowledge of ineffective internal controls, and having professed to learn the correct way to (1) calculate standalone selling price and to (2) determine the period over which to recognize service and subscription revenue, both subjects of previous

restatement, Defendants disclosed materially false financial numbers for 3Q25.

113. In each of the 1Q25 10-Q, the 2Q25 10-Q, and the 3Q25 10-Q, Defendants stated that their internal controls over financial reporting were "not effective." Defendants Lerner and Gianella assured investors that the financial statements were nonetheless accurate, writing in each 10-Q that:

> Notwithstanding the identified material weaknesses, management, including our chief executive officer and chief financial officer have determined, that the condensed consolidated financial statements included in this Form 10-Q fairly represent in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, for the periods presented in accordance with U.S. generally accepted accounting principles.

114. The foregoing statement was false in each of the 1Q25 10-Q, the 2Q25 10-Q, and the 3Q25 10-Q, because in the context of failing to update SSP starting with 1Q25, Defendants were duty-bound to disclose that the financial statements in each filing did not represent in all respects the Company's financial condition, and that Defendants had failed to update SSP, in violation of GAAP and Quantum's own accounting policies.

## VI. THE TRUTH EMERGES

115. On April 3, 2025, Quantum filed a Form 8-K announcing that Defendant Gianella was no longer Quantum's CFO.

116. On May 6, 2025, Quantum provided preliminary financial results for its fiscal fourth quarter ended March 31, 2025. Quantum also announced that it would release its full results for the fiscal fourth quarter and full fiscal year 2025 in mid-June 2025.

117. On June 3, 2025, Quantum filed a Form 8-K stating that as of June 2, 2025, Defendant Lerner was no longer Quantum's CEO. According to FE1, Lerner was forced out of his position by the Board of Directors.

118. The Company appointed Hugues Meyrath, a board member, to replace Lerner as Quantum's CEO.

119. On June 30, 2025, after the market closed, Quantum Corporation filed with the SEC a Notification of Late Filing on Form 12b-25, announcing that it would not timely file its fiscal year 2025 Annual Report because:

> Quantum Corporation (the "Company") has determined that it is unable to file its Annual Report on Form 10-K (the "Form 10-K") for the fiscal year ended March 31, 2025 ("Fiscal 2025") by June 30, 2025, the original due date for such filing, without unreasonable effort or expense due to the circumstances described below.
>
> ***The Company is reviewing its accounting related to certain revenue contracts as well as the application of standalone selling price under applicable accounting standards***. The results of the review will need to be reflected in the Company's financial statements for Fiscal 2025 in the Form 10-K. The Company does not expect the current review will affect the Company's financial statements for any fiscal periods prior to Fiscal 2025.
>
> As a result, the Company has been unable to complete its consolidated audited financial statement close process for Fiscal 2025, and therefore unable to compile in a timely manner, without unreasonable effort or expense, the consolidated financial information required to prepare the Form 10-K for Fiscal 2025, within the prescribed time period.

120. On this news, the price of Quantum Corporation stock fell $1.00 per share on July 1, 2025, or 10%, to close at $8.97.

121. On July 8, 2025, quantum announced that it had informed Henk Jan Spanjaard, Quantum's Chief Revenue Officer, of its intent to terminate his employment.

122. On August 8, 2025, after the market closed, the Company filed with the SEC a current report on Form 8-K ("August 8 8-K") which announced, among other things, that the Company's 3Q24 financials could not be relied upon and would be restated to show a new decrease of approximately $3.9 million in total revenue, because, in part, "the standalone selling price that is used to allocate revenue under Topic 606 needed to be updated." Further, there were

deficiencies in the Company's internal control over financial reporting and the Company's disclosure controls and procedures that constituted material weaknesses as of December 31, 2024 and March 31, 2025. The August 8 8-K stated:

> On August 8, 2025, the Board of Directors (the "Board") of Quantum Corporation (the "Company") concluded that ***the Company's previously-issued unaudited interim condensed consolidated financial statements for the fiscal third quarter ended December 31, 2024 contained in its Quarterly Report on Form 10-Q*** (the "Non-Reliance Period"), as well as its disclosures related to such financial statements, including any reports, earnings releases, and investor presentations, and related communications issued by or on behalf of the Company with respect to the Non-Reliance Period, including management's assessment of internal control over financial reporting and disclosure controls and procedures, ***should no longer be relied upon***. The determination by the Board was made upon the recommendation of the Audit Committee (the "Audit Committee") of the Board and after consultation with the Company's management team.
>
> In June 2025, the Company identified certain service and subscription revenue inconsistencies during the Non-Reliance Period, which is deferred under Accounting Standards Codification Topic 606 ("Topic 606") and recognized ratably over the term of the contract. The Company's management reviewed and updated the periods over which revenue was being recognized to ensure consistent application for all service contracts invoiced in the fiscal year ended March 31, 2025 and the results have been applied to revenue. The Company's management determined that no contracts entered into prior to fiscal year ended March 31, 2025 were impacted. ***The Company also determined that the standalone selling price that is used to allocate revenue under Topic 606 needed to be updated for the fiscal year ended March 31, 2025 resulting in an adjustment to revenue. As a result of these errors, the Company will restate the financial statements for the Non-Reliance Period (the "Restatement"). Subject to completion of its financial close procedures, the Company currently expects the Restatement will result in a decrease of approximately $3.9 million in revenue and a similar decrease in net loss from operations in the Non-Reliance Period.***
>
> In connection with the Restatement, ***the Audit Committee concluded, with concurrence of management, that there were deficiencies in the Company's internal control over financial reporting and the Company's disclosure controls and procedures that constituted material weaknesses as of December 31, 2024 and March 31, 2025***. The Company expects to report material weaknesses related to the Company's revenue recognition. As a result of these expected material weaknesses, the Company believes that it did not maintain effective entity-level controls within the control environment to prevent or detect material misstatements. Additional deficiencies or material weaknesses in the Company's internal controls may be identified during its review. The Company's full assessment of the

> effectiveness of its internal control over financial reporting will be described in more detail in the Annual Report on Form 10-K for the year ended March 31, 2025 (the "2025 10-K").
>
> There were also adjustments to the fiscal quarters ended June 30, 2024 and September 30, 2024. However, these adjustments were not material and are not required to be restated. They will be revised in the comparative period information when the Company issues its Quarterly Reports on Form 10-Q for the fiscal quarters ending June 30, 2025 and September 30, 2025.
>
> The Audit Committee has discussed the matters disclosed in Item 4.02 of this Current Report on Form 8-K with Grant Thornton LLP ("Grant Thornton"), the Company's independent registered accounting firm.

123. On this news, the price of Quantum Corporation stock fell by $0.14 per share to close at $7.43 on August 11, 2025.

124. On August 18, 2025, after the market closed, the Company filed with the SEC a current report on Form 8-K ("August 18 8-K"). The August 18 8-K disclosed, among other things, that the Company's CFO, Lewis W. Moorehead, would be resigning from his role – after holding it for less than five months. It further disclosed that the Company anticipated that "the Restatement will result in a decrease of approximately $3.9 million in revenue and a similar decrease in net loss from operations in the Non-Reliance period…."

125. On this news, the price of Quantum Corporation stock fell by $0.61 per share, or 8.2%, to close at $6.83 on August 19, 2025.

126. On August 26, 2025, Quantum finally filed its 2025 10-K for the fiscal year ended March 31, 2025. About its Restatement, Quantum stated:

> a. Service contract term - The Company identified that there were inconsistencies in the period used to recognize service and subscription revenue, which is deferred under Topic 606 and recognized ratably over the contractual term of the contract. The Company's management reviewed and updated the periods over which revenue was being recognized to ensure consistent application for all service contracts invoiced in the fiscal year ended March 31, 2025 and the results have been applied to revenue.

b. ***Application of Topic 606 related to standalone selling price - The Company also determined that the standalone selling price that was being used for the fiscal year ended March 31, 2025 needed to be updated resulting in an adjustment to revenue. Standalone selling price has now been refreshed for all goods and services sold in a bundled contract under Topic 606, maximizing the use of observable inputs***

127. The Restatement included, but, in violation of ASC 250 did not separately identify or disclose, adjustments made to the 1Q25 and 2Q25 financial statements.[8]

128. The 2025 10-K also disclosed that the Company's disclosure controls and procedures were not effective as of March 31, 2025 due to the following material weaknesses in the internal control over financial reporting, including calculation of standalone selling price:

> **Management's Annual Report on Internal Control over Financial Reporting**
>
> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our internal control over financial reporting using the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control—Integrated Framework (2013)*. Based on this assessment, management concluded that ***the Company's internal control over financial reporting was not effective as of March 31, 2025, due to the material weaknesses described below.***
>
> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.
>
> Management did not adequately design and implement effective control activities resulting in the identification of the following material weaknesses:
>
> *Revenue Recognition*
>
> The Company did not maintain effective internal controls related to revenue recognition for the following:

[8] The Company had improperly determined that the errors in its 1Q25 and 2Q25 financial statements were immaterial, and consequently failed to restate these financial statements. The Company revised these financial statements when it filed its Forms 8-K for 1Q26 and 2Q26.

- **Controls related to the Company's accounting practices and procedures for application of standalone selling price** under Accounting Standards Codification Topic 606 *Revenue from Contracts with Customers* ("Topic 606"). **Specifically, the Company did not have adequate controls in place to conclude on the application of standalone selling price consistent with the generally accepted application of the guidance in Topic 606.**
- **Controls over the accuracy of the inputs in the sales order entry process. Specifically, the Company did not sufficiently execute controls over the review of data inputs in the sales order entry process to ensure accuracy of the price, quantity, and related customer data**.
- **Controls for reviewing and updating deferral schedules, which drives the timing of service revenue recognition. Specifically, the start and end dates in the deferral schedules were not consistently aligned with the contractual service periods.**

*Manufacturing Inventory*

The Company did not maintain effective internal controls related to manufacturing inventory. Specifically, controls to assess the accuracy of inventory held at third-party locations were not adequately executed as of March 31, 2025.

*Control Environment*

Based on the material weaknesses identified in revenue recognition and manufacturing inventory, management concluded that the Company did not maintain effective entity-level controls within the control environment to prevent or detect material misstatements to the Consolidated Financial Statements. Specifically, the Company (i) lacked sufficiently qualified staff or resources to perform control activities and (ii) conducted inadequate risk assessment and monitoring activities resulting in untimely or ineffective identification of internal control risks to support the design implementation and evaluation of the internal controls necessary to provide effective oversight over financial reporting.

**The material weaknesses related to the stand-alone selling price and deferred schedules resulted in material adjustments to the revenue and deferred revenue accounts and related disclosures in the unaudited Consolidated Financial Statements for the three months ended December 31, 2024.** While the material weaknesses related to sales order and invoice review, and manufacturing inventory did not result in material misstatements, each creates a reasonable possibility that a material misstatement could occur and not be prevented or detected on a timely basis.

129. In a Form 8-K dated October 6, 2025, Quantum announced that on September 30, 2025, it had dismissed Grant Thornton LLP as Quantum's auditor. The audit committee appointed CohnReznick as Quantum's new auditor.

## VII. LOSS CAUSATION AND ECONOMIC LOSS

130. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Quantum's common stock and operated as a fraud or deceit on Class Period purchasers of Quantum's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market and the price of Quantum's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Quantum's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages under federal securities laws.

131. In particular, as described above, Quantum's filings on June 30, 2025, August 8, 2025, and August 18, 2025 caused Quantum's common stock price to fall materially. These disclosures corrected Defendants' prior misstatements.

## VIII. NEITHER THE PSLRA SAFE HARBOR NOR THE BESPEAKS CAUTION DOCTRINE APPLIES

132. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from present statements concerning later-restated financial statements.

133. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements"

when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

134. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Quantum who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## IX. PLAINTIFF'S CLASS ACTION ALLEGATIONS

135. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's common stock publicly traded on NASDAQ during the Class Period, and who were damaged thereby ("Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

136. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and

can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

137. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

138. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

139. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

140. To establish reliance on a class wide-basis, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;
- as a public issuer, the Company filed periodic public reports;
- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and
- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

141. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

142. Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

143. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## X. COUNTS

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against Defendants Quantum, Lerner, and Gianella**

144. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

145. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

146. During the Class Period, in violation of Rule 10b-5(b), Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading.

147. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

148. Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

149. Defendants Lerner and Gianella, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the

alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

150. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

151. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

152. As a direct and proximate result of Defendants' wrongful conduct alleged herein, Plaintiff and other members of the Class suffered damages in an amount to be established at trial.

153. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**

**Form Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

154. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

155. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

156. As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

157. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

158. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of itself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## XII. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 27, 2026

**THE ROSEN LAW FIRM, P.A.**

By: *Gonen Haklay*
Gonen Haklay
Jacob A. Goldberg
101 Greenwood Avenue, Suite 440
Philadelphia, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2026, I electronically filed the foregoing ***Amended Class Action Complaint for Violations of the Federal Securities Laws*** with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Gonen Haklay*

Gonen Haklay
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: ghaklay@rosenlegal.com